UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CHERYL M. McCAIN,                    )
                                     )
                 Plaintiff,          )
                                     )
        v.                           )       No. 4:08 CV 971 DJS
                                     )                        DDN
                                     )
 MICHAEL J. ASTRUE,                  )
Commissioner of Social Security,     )
                                     )
                 Defendant.          )

**REPORT AND RECOMMENDATION OF**
**UNITED STATES MAGISTRATE JUDGE**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Cheryl M. McCain for disability insurance benefits under Title II, and Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. § 401, et seq. The action was assigned to the undersigned United States Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b). For the reasons set forth below, the undersigned recommends that the ALJ's decision be affirmed.

**I.  BACKGROUND**

Plaintiff Cheryl M. McCain was born on September 17, 1965. (Tr. 40.) She is 4'10" tall with a weight that has ranged from 184 pounds to 205 pounds. (Tr. 86, 152.) She is married, but separated, and has one child. (Tr. 81, 84.) She completed high school, two years of college, and received vocational training as an administrative medical assistant. (Tr. 85, 117.) She last worked as an administrative medical assistant. (Tr. 199.)

On March 16, 2006, McCain applied for disability insurance benefits, alleging she became disabled on February 15, 2006, on account

of severe neck and back problems stemming from a car accident.[1] (Tr. 47, 69.) She received a notice of disapproved claims on May 16, 2006. (Tr. 47-51.) On June 4, 2006, McCain submitted a request for reconsideration. (Tr. 52.) In that request, she noted her entire spine was defective, she was in severe pain constantly, took a lot of medication, and was unable to perform normal daily activities without difficulty. (Tr. 52.) After a hearing on March 21, 2007, the ALJ denied benefits on April 28, 2007. (Tr. 8-20, 24-39.) On May 20, 2008, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 2-4.)

## II.  MEDICAL HISTORY

On an unknown date, McCain completed a disability report. She indicated severe neck and back problems limited her ability to work, by making it difficult to sit and bend on the job. She could not sit for more than thirty to sixty minutes on the job because of pain, and bending only exacerbated the pain. The conditions first bothered McCain on February 5, 2005. She continued working, but with fewer hours because she was seeing a chiropractor three times a week. Her co-workers helped her with some of the job duties that required bending. On February 15, 2006, McCain stopped working altogether, and she has not worked since. (Tr. 110-18.)

On an unknown date, McCain completed a disability report appeal. She indicated her condition had become worse, and she was starting to have severe headaches, chest pains, and was experiencing mental and emotional stress because she could not perform normal daily activities without difficulty. The stress manifested in crying spells, and McCain became frustrated, irritated, and nauseous on a regular basis. She was taking Phenadrine Citrate to relax her muscles, Effexor for anxiety, Hydrocodone for pain relief, and Lisinopril for hypertension.[2] These

---

[1]On March 19, 2007, McCain changed her onset date from February 5, 2005, to February 15, 2006. (Tr. 28, 69, 105.)

[2]Hydrocodone is a narcotic pain reliever, used for a short period of time, to treat moderate to severe pain. Effexor is an antidepressant
(continued...)

drugs caused drowsiness and altered her mobility. McCain noted it was difficult and painful to perform any daily activity, such as bathing, combing her hair, or getting dressed, without someone's help. (Tr. 142-48.)

On February 5, 2005, McCain was involved in a car accident. (Tr. 86.) She was rear-ended by another car. She had no pain the night of the accident, but had a gradual onset of pain the next day. (Tr. 159.) An x-ray of the lumbosacral spine showed mild hypertrophic changes in the lumbar spine.[3] Otherwise, the x-ray was negative. The vertebral bodies were maintained in normal alignment without any evidence of fracture, disk-space narrowing, or any other significant abnormality. (Tr. 215.)

On February 7, 2005, McCain went to the hospital, complaining of mild pain, and injuries to her neck and lower back. A physical examination showed no numbness, dizziness, chest pain, difficulty breathing, or weakness. She did not have a headache, nausea, abdominal pain, or vomiting. McCain was alert and in no acute distress. There was mild tenderness in the right and left trapezius, but no deformity or muscle spasm, and no limitation in range of motion. Her breathing was normal, her abdomen was soft, and her skin was intact. Her back showed mild soft-tissue tenderness in the left mid- and lower-lumbar area, but there was no costovertebral angle tenderness (CVA).[4] McCain was diagnosed with back pain, notably a lumbar strain and cervical strain stemming from a car accident. She was told to apply ice, and use

---

[2](...continued)
used to treat depression and mood disorders. Lisinopril is used to treat high blood pressure. WebMD, http://www.webmd.com/drugs (last visited July 9, 2009).

[3]Hypertrophy refers to the general increase in bulk of a part or organ, not due to tumor formation. Stedman's Medical Dictionary, 746 (25th ed. Williams & Wilkins 1990).

[4]Costovertebral angle tenderness (CVA), if present, indicates renal disease. Medical Informatics, http://medinfo.ufl.edu/year1/bcs/clist/abdomen.html#ADD (last visited July 9, 2009).

Flexeril and Ibuprofen.[5]  She was discharged in stable condition.  (Tr. 159-61.)

On February 18, 2005, McCain began physical therapy.  Cheryl Buringrud, P.T., observed that McCain complained of pain and muscle spasms, impaired posture, and reduced range of motion, strength, and endurance.  Buringrud planned to have McCain participate in physical therapy three times a week for three weeks.  (Tr. 190-91.)

On March 25, 2005, McCain complained of neck spasms, but her movements appeared "full and made with ease."  (Tr. 177.)

On April 6, 2005, McCain participated in physical therapy.  She reported significant improvement, with reduced frequency and intensity of her pain.  Her pain had gone from 4/10 to 2/10 or 1/10, and had gone from constant to intermittent.  Buringrud noted McCain had responded well to therapy and decreased her frequency to twice a week, for two weeks.  (Tr. 194.)

On April 19, 2005, medical notes indicated McCain's movements appeared to be full and made with ease.  Her muscle condition was normal, though some tenderness remained along the right shoulder-blade border.  (Tr. 178.)

On September 13, 2005, an MRI of the cervical spine revealed degenerative disk disease at several levels and a low signal posterior from C2-3 to C6-7, suggesting some ossification of the posterior

---

[5]Flexeril is a muscle relaxant and is used with rest and physical therapy to decrease muscle pain and spasms.  Ibuprofen, or Motrin, is an anti-inflammatory drug used to relieve pain and swelling.  WebMD, http://www.webmd.com/drugs (last visited July 9, 2009).

ligament.[6]  There was no evidence of any overt central canal stenosis.[7]
(Tr. 213-14.)

On September 16, 2005, medical notes indicated McCain's movements
were restricted.   Tenderness was noted in the right shoulder-blade
region and the right back-of-the-neck region.  (Tr. 179.)

On September 23, 2005, David Shaw, M.D., referred McCain to James
Lu, M.D., a neurologist.  McCain's chief complaints were neck pain,
shoulder pain, lower back pain, and tingling in the right and upper
lower extremities. Sitting aggravated her neck and shoulder pain, while
standing aggravated her lower back pain.  She said her symptoms of pain
and stiffness were constant, but fluctuated in intensity.   She also
complained of headaches, dizziness, and balance problems.  A physical
examination showed McCain was stocky, well-nourished, and in no apparent
distress.  She was pleasant and cooperative, and was accompanied by her
sister and mother.  Her neck showed no significant tenderness along the
axial, cervical, or thoracic spine, though there was some diffuse
tenderness in the paraspinous regions.  She had mild limitation of her
cervical range of motion in all modalities, and moving her neck
increased neck pain.  There was no evidence of any obvious cervical
spine deformity.  (Tr. 168-70.)

A neurological exam showed McCain had mild weakness, 4+/5, in the
right deltoid, bicep, tricep, iliopsoas (hip muscles), quadriceps, and
hamstrings.  Otherwise, her overall strength was 5/5.  An MRI of the
cervical spine from September 13, 2005, showed mild degenerative disk
disease from C2-3 to C6-7.  There was also a mild segmental ossification

_____

[6]The human spinal column consists of thirty-three vertebrae.  There
are seven cervical vertebrae (denoted C1-C7), twelve thoracic vertebrae
(denoted T1-T12), five lumbar vertebrae (denoted L1-L5), five sacral
vertebrae (denoted S1-S5 and fused together into one bone, the sacrum),
and four coccygeal vertebrae (fused together into one bone, the coccyx).
The cervical vertebrae form part of the neck, while the lumbar vertebrae
form part of the lower back.  The sacrum is immediately below the lumbar
vertebrae.  Stedman's Medical Dictionary, 226, 831, 1376, 1549, 1710,
Plate 2.  Ossification refers to the formation of bone.  Id., 1106.

[7]Stenosis is the narrowing or constriction of any canal.  Stedman's
Medical Dictionary, 1473.  Spinal stenosis refers to the narrowing of
the spinal cord.

- 5 -

of posterior ligaments present at multiple levels, particularly at C5-6, and mild end plate spondylosis at C4-5 and C5-6.[8] However, Dr. Lu found these changes did not appear to have produced any significant stenosis at any level. There was also no evidence of any spinal cord compression. Dr. Lu did not believe McCain's symptoms were consistent with either radiculopathy or myelopathy.[9] The MRI findings did not clearly account for her symptoms. Dr. Lu recommended against spine surgery, and instead, recommended aggressive conservative management, with chiropractic therapy, physical therapy, and medication. (Tr. 168-70, 213-14.)

On September 28, 2005, McCain participated in physical therapy. Joan Gettemeyer, P.T., found McCain had symptoms consistent with cervical disk pathology. Gettemeyer recommended several different exercises to decrease her pain, and increase her range of motion and strength. (Tr. 199.)

On November 15, 2005, medical notes indicated McCain's movements were full. Her muscle condition was normal, though some tenderness remained along the shoulder-blade border. (Tr. 181.)

On January 30, 2006, medical notes indicated McCain's cervical motion appeared restricted during consultation. (Tr. 182.)

On February 15, 2006, McCain went to the emergency room, complaining of abdominal and flank pain. At the time, she was taking Norflex, Quinapril, and Darvocet.[10] A physical examination showed McCain had normal range of motion in her neck, and the cervical spine was non-tender. Her abdomen showed no signs of hernias or masses, but there was tenderness in the right upper quadrant. Her back was normal to inspection, with no CVA tenderness. McCain was diagnosed with abdominal

---

[8]Spondylolysis is degeneration of the articulating, or joining, part of a vertebra. Stedman's Medical Dictionary, 1456.

[9]Radiculopathy is a disease of the spinal nerve roots. Stedman's Medical Dictionary, 1308. Myelopathy is a disturbance or disease of the spinal cord. Id., 87, 1013.

[10]Norflex is used treat pain and discomfort from muscle injuries. Quinapril is used to treat high blood pressure. Darvocet is a drug with a narcotic component and is used to treat mild to moderate pain. WebMD, http://www.webmd.com/drugs (last visited July 9, 2009).

pain, possibly from constipation or intestinal adhesions.  She also had an enlarged right ovary.  John Schwent, D.O., prescribed Vicodin, and told McCain to stay off work for the next two days.[11]  (Tr. 221-33.)

On February 15, 2006, Megan Gau, M.D., reviewed an x-ray of McCain's abdomen and pelvis.  The x-ray showed the lungs, liver, spleen, and pancreas were unremarkable.  There was no evidence of kidney stones or bladder stones.  (Tr. 217-18.)

On February 22, 2006, McCain saw Rachel Feinberg, M.D., complaining of pain that was steadily growing worse since her car accident a year ago.  In particular, McCain noted severe lower right back pain, with some pain radiating into the lower right quadrant.  McCain complained of spasms up and down her spine.  A physical examination showed McCain did not "exhibit any type of exaggerated pain behavior."  When standing, McCain's feet were severely pronated.[12]  She moved her back fearfully during range of motion exercises, for fear of getting a spasm.  The range of motion test revealed McCain had limited flexion and extension, particularly on rotation to the left.  Range of motion of the lower back was limited because McCain was hesitant to move.  Reviewing an MRI from March 13, 2005, Dr. Feinberg found evidence of multi-level degenerative disk disease, but no overt central canal stenosis.  An x-ray of the lumbar spine showed mild hypertrophic changes in the lumbar spine, but no sign of any major fracture of dislocation.  Dr. Feinberg found the physical findings were consistent with McCain's complaints.  She recommended a course of manual therapy focusing on mobilization of the joints and spine, and possibly injections.  (Tr. 255-57.)

On March 6, 2006, McCain saw Dr. Feinberg complaining of lower back pain, body pain on her right side, shooting pain, and significant

---

[11]Vicodin is a combination narcotic and non-narcotic, and is used to relieve moderate to severe pain.  WebMD, http://www.webmd.com/drugs (last visited July 9, 2009).

[12]A pronated foot is one that rolls inward when walking or running and does not properly pass the weight over the foot.  This creates a biomechanical problem that stresses the foot and lower leg.  The knee and hip are affected as well because of the inward rotation of the leg.  People with pronating feet are at risk for developing overuse injuries.  University of Iowa Hospitals & Clinics, http://www.uihealthcare.com/topics/footcare/foot3353.html (last visited July 9, 2009).

depression. A physical examination showed McCain was hypersensitive to touch. Dr. Feinberg administered a series of trigger point injections, and advised McCain to continue with physical therapy. (Tr. 254.)

On March 21, 2006, McCain saw Dr. Feinberg. McCain said her back pain was doing better, but that her Effexor made her jittery at night. Dr. Feinberg prescribed Cymbalta instead, and ordered a leg-length x-ray to evaluate the placement of McCain's pelvis. (Tr. 253, 278.) The x-ray revealed McCain's right leg was 68.6 centimeters long and her left leg was 68.4 centimeters long. (Tr. 278.)

On March 23, 2006, McCain completed a functional capacity form during physical therapy. She could occasionally grasp or hold items, but otherwise, indicated she was completely unable to sit, stand, walk, climb stairs, squat, complete housework, lift items, or drive. She checked the box stating "I'm in desperate need of help." (Tr. 89.)

On March 24, 2006, R. Williams, a disability examiner, completed a telephone interview with McCain. Williams noted that McCain was pleasant, and answered the questions with little difficulty. At times, "it sounded as if she was experiencing some sort of pain while on the phone. . . ." (Tr. 105-08.)

On March 27, 2006, McCain saw Dr. Shaw, complaining of ongoing pain. The medical notes indicate she had seen a chiropractor and neurosurgeon for pain management, but that she still could not sit or stand for any length of time. A physical examination revealed McCain was in moderate distress from the pain and exhibited weakness in her right side from the pain. She had full range of motion in the extremities. Dr. Shaw diagnosed McCain with pain in the neck, lower back, right arm, legs, and with paresthesias of the right side.[13] (Tr. 238.)

On March 27, 2006, Dr. Shaw completed a physician's statement on a life insurance form. Dr. Shaw found McCain had neck and lower back pain, right arm and leg pain, and paresthesias. Dr. Shaw indicated there were no secondary conditions contributing to disability. He indicated McCain's condition was not work related. She had not

---

[13]Paresthesia is an abnormal sensation, such as burning, pricking, or tingling. Stedman's Medical Dictionary, 1140.

undergone any surgical procedures, and Dr. Shaw did not foresee surgery in the near future. At the time, McCain was taking Vicodin, Norflex, Effexor, and Ibuprofen. She had not been referred to physical therapy. Dr. Shaw checked the box for "none" when asked to describe how long McCain could stand, sit, walk, or drive. Dr. Shaw found she could occasionally bend, squat, climb, reach, kneel, crawl, use her feet, and drive. He thought she could only lift ten pounds. (Tr. 86-87.)

On April 6, 2006, McCain participated in physical therapy. The notes indicate she had minimal complaints, her pain level was down, and was progressing with increased tolerance to manual therapy. McCain noted that her lower back was feeling better. (Tr. 262.)

On April 10, 2006, McCain completed a work history report. From September 1990 to 1992 she worked as a claims file clerk for an insurance company. From July 1998 to "present," she worked as an administrative medical assistant, seven hours a day, five days a week. As part of the job, she was in charge of schedules, she assisted patients, trained new employees, filed charts, and created charts. In a typical day, she walked two hours, stood two hours, and sat for five hours. She lifted up to twenty pounds, and frequently lifted ten pounds. (Tr. 119-26.) McCain received special help on the job, since she had trouble sitting and bending. (Tr. 98-104.)

On April 10, 2006, McCain completed a function report. In a typical day she awoke at 8:00 a.m., and had someone prepare her breakfast so that she could take her medication. A family member helped her get dressed, and if she had an appointment, a family member would drive her to the doctor's office. After the medication had taken effect, McCain would usually sleep for three or four hours. A family member would also prepare lunch and dinner. At night, McCain would sit up or walk for a short period of time. She typically went to sleep around 9:00 or 10:00 p.m. McCain helped care for her daughter, who is visually impaired, and helped her mother with her finances. McCain's sister helped her with chores, drove her to doctors' appointments, and helped her fill out forms. McCain had difficulty sleeping, getting dressed, bathing, and combing her hair. She was able to feed herself and go to the bathroom by herself, but sitting hurt her back, neck,

shoulders, and arms.  McCain could make a sandwich, but someone else prepared her meals.  She did not do any housework or yardwork.  McCain went outside for her daily walk in the backyard, or when she had a doctor's appointment.  McCain had a driver's license, but no longer drove.  McCain used to enjoy cooking, reading, baking, and decorating cakes, but could no longer do these activities because of fatigue.  She used to go to church on a regular basis, but prolonged sitting gave her pain.  (Tr. 127-32.)

McCain was able to follow instructions, but her attention span was short.  Anytime she stood to walk, she felt pressure and pain - no matter the distance and no matter how long she rested.  In her remarks, McCain indicated she could not lift, squat, bend, reach or kneel, because of chronic pain in the neck, shoulders, back, spine, lower back, and hip area.  Because of the chronic pain, she had trouble climbing stairs, walking and standing.  Sitting was especially difficult because it produced severe pressure and pain in the neck, back, shoulder, and spine.  McCain could use her hands, but experienced stiffness, and needed help completing tasks like getting dressed, combing her hair, and bathing.  She had trouble concentrating because of all the medications.  Finally, McCain could become very irritable, frustrated, and depressed, at no longer being able to function in a normal capacity.  (Tr. 132-34.)

On April 10, 2006, McCain completed a pain questionnaire.  She complained of severe, sharp pains in her neck, aches in her shoulders, and shooting pain in her arms, legs, and down her spine.  She had stiffness and aches in her fingers and back.  The pain was constant.  Sitting, standing, bending, and any physical activity brought on the pain.  Pain medication, therapy, and sleep helped to relieve the pain, but even with the medication and therapy, the pain was fairly constant.  At the time of the questionnaire, McCain was taking Hydrocodone, Norflex, Effexor, and Lisinopril.  The medications produced fatigue, nausea, dizziness, anxiety, nervousness, and upset stomach.  Finally, McCain noted experiencing weakness in her arms and legs.  (Tr. 135.)

On April 11, 2006, McCain saw Dr. Feinberg, complaining of pain radiating down the right arm.  Dr. Feinberg administered a median branch

nerve block, and instructed McCain to continue with physical therapy. (Tr. 251.)

On April 18, 2006, McCain saw Dr. Feinberg, complaining of lower back pain and pressure in the front of her neck. A physical examination showed the sacrum was extended and the right sacroiliac joint was compressed with poor movement. Dr. Feinberg performed a sacroiliac joint injection without complication. (Tr. 250.)

On May 2, 2006, William Baber, M.D., reviewed an x-ray of McCain's thoracic spine and neck spine. The thoracic x-ray showed small spondylitic spurs at T5-6, T6-7, T7-8, T11-12, and T12-L1. The vertebral bodies appeared to be in good alignment and the intervertebral disk spaces appeared to be well maintained throughout the thoracic region. The neck x-ray showed mild spondylitic spurs at C2-3, C5-6, and C6-7, and mild facet osteoarthritis at C5-6. The intervertebral disk spaces appeared to be well maintained throughout the cervical spine. "With flexion and extension there does not appear to be evidence of significant instability." (Tr. 358-59.)

On May 9, 2006, Dr. Feinberg gave McCain cervical epidural steroid injections for radicular symptoms. (Tr. 354.)

On May 20, 2006, McCain went to the emergency room, complaining of chronic headaches and chest pain. She had a history of hypertension, which was being treated, and chronic back and neck pain. She had no previous psychiatric history. A physical examination showed her neck had normal range of motion and her cervical spine was non-tender. Her chest was non-tender and there were no signs of respiratory distress. Her back was normal upon inspection, with no CVA tenderness. She had normal range of motion in the upper and lower extremities. McCain had no sensory or motor deficits, and was pleasant and smiling during the interview. A chest x-ray was negative, with no evidence of masses, effusions, or free air. There was no evidence of any cardiac or pulmonary disease. McCain was discharged feeling well with her chest pain gone. Her attending physician, Milton Sallis, prescribed

Percocet.[14] (Tr. 288-91, 298.) According to the nursing notes, after triage, McCain asked if she had "time to go out and smoke a cigarette," even though she had denied smoking and drinking. (Tr. 293, 295.)

On May 26, 2006, McCain saw Dr. Feinberg, and noted her cervical pain and lower back pain were better, but that she still had pressure in her chest. Dr. Feinberg administered a Marcaine and Depo-Medrol injection.[15] (Tr. 353.)

On June 2, 2006, McCain saw Dr. Feinberg, who performed a cervical facet block and a thoracic facet block. Dr. Feinberg diagnosed McCain with cervical radiculopathy and thoracic spondylosis. (Tr. 352.)

On June 29, 2006, McCain saw Dr. Feinberg, who administered Xylocaine injections.[16] Dr. Feinberg's plan was to have McCain continue to participate in physical therapy. (Tr. 349.)

On August 8, 2006, McCain participated in physical therapy. It was her twenty-ninth visit, but she still noted significant pain. (Tr. 332.) That same day, McCain saw Dr. Feinberg. In her procedure notes, Dr. Feinberg remarked that McCain's internist was frustrated with McCain's chronic pain, and did not think that the severity of her pain matched her exam. Dr. Feinberg also administered trigger point injections, after which, McCain had much less lower back pain. (Tr. 346.)

On August 29, 2006, Dr. Feinberg injected McCain in the back with Marcaine and Depo-Medrol. (Tr. 345.)

On December 21, 2006, an MRI of the lumbar spine showed there was no focal disk protrusion. (Tr. 413.)

On January 10, 2007, Dr. Shaw referred McCain to James Williams, M.D., for a consultation. McCain was complaining of pain throughout her

---

[14]Percocet is an opiate-type medication, used to relieve moderate to severe pain. WebMD, http://www.webmd.com/drugs (last visited July 9, 2009).

[15]Depo-Medrol injections are used to treat joint and pain swelling that occurs with arthritis. WebMD, http://www.webmd.com/drugs (last visited July 9, 2009).

[16]Xylocaine is a local anesthetic that works by causing temporary numbness in the skin and mucous membranes. WebMD, http://www.webmd.com/drugs (last visited July 13, 2009).

entire spine, in her right shoulder, in her head, across her chest, in her upper back, and in her arms and legs. She attributed her pain to the car accident, because she had not experienced any pain issues before the accident. McCain was taking Hydrocodone for pain, which improved her symptoms by about 30%, Effexor for anxiety, Zanaflex for muscle spasms, Temazepam for help sleeping, Gabapentin for what she called her "electrical shocks," and Lidoderm for her pain.[17] McCain's activity level during the day was extremely low, with her being up and about for only two or three hours in a day. (Tr. 396-400.)

A physical examination found McCain "demonstrated significant abnormal pain behavior (e.g. profound give-way weakness on the right > left inconsistent with her functional strength, reports of pain in her neck and low back with examination maneuvers that did not stress these anatomical structures. . . .)" Dr. Williams added that any special testing produced "complaints of pain (usually back or neck) with all maneuvers, often before significant tissue tension was achieved." Dr. Williams reviewed an MRI of the lumbar spine and the cervical spine, and found no evidence of any significant neural impingement for either. (Id.)

Dr. Williams diagnosed McCain with generalized pain, lower back pain, and neck pain, but with no evidence of neural compromise or any musculoskeletal or neuromuscular symptoms for their cause. Dr. Williams hoped to reduce McCain's medication levels because he believed they were contributing to her low activity levels. He also encouraged her to spend more time out of bed, and more time walking. Finally, Dr. Williams recommended she "go back to work as soon as possible. Ultimately, this is her decision but could conceivably happen within weeks to possibly a few months." (Id.) Dr. Shaw agreed with Dr. Williams's note and his decision to refer McCain to a psychiatrist. (Tr. 402.)

---

[17]Gabapentin is used to help control seizures. Lidoderm is used to relieve nerve pain after shingles. Temazepam is used to treat insomnia. Zanaflex is used to treat muscle tightness and cramping cause by conditions such as multiple sclerosis or spinal injury. WebMD, http://www.webmd.com/drugs (last visited July 9, 2009).

On January 11, 2007, Anthony Margherita, M.D., completed an independent medical evaluation. McCain was adequately groomed and casually dressed at the time of the evaluation. A physical examination revealed McCain was obese, but alert and oriented with cognitive functions intact. The lungs had a normal respiratory function, the abdomen was soft without guarding, and there was no edema or cyanosis peripherally.[18] The physical examination was unremarkable. During a cervical spine exam, Dr. Margherita found McCain "self-limited her range of motion during the exam." An indirect assessment of her cervical range of motion showed her range was within normal limits in all planes. A shoulder examination demonstrated self-restricted movement, but normal range of motion with functional testing. Thoracic range of motion was within normal limits. Lumbar range of motion was limited by McCain's self-limiting behavior. During a hip exam, McCain self-limited, and was tender at virtually all palpation points. With weight-bearing, there was normal femoral alignment. A neurological exam showed no significant muscle atrophy and no weakness in the upper and lower extremities. Reflex testing showed no pathologies. (Tr. 305-09.)

Dr. Margherita concluded that McCain repeatedly failed to provide her best effort during testing and failed to demonstrate her abilities with respect to range of motion testing, strength, and other measures. From a functional standpoint, Dr. Margherita found no significant abnormal findings. Based on the emergency room records, he found McCain had sustained a strain injury in the cervical and lumbar areas, and suffered from ossification of the posterior longitudinal ligament. Based on his findings, Dr. Margherita would not recommend further physical treatment, but did believe a psychiatric evaluation could prove useful. And because he did not find any objective evidence of an ongoing impairment, Dr. Margherita was unable to place any significant restrictions on McCain. He believed she could frequently sit, stand, walk, bend, squat, and drive, and perform medium lifting. (Tr. 309-26.)

---

[18]Edema is an accumulation of watery fluid in cells, tissues, or cavities. <u>Stedman's Medical Dictionary</u>, 489. Cyanosis occurs when the skin becomes purple and blue due to deficient oxygenation of the blood. <u>Id.</u>, 383.

On February 8, 2007, David J. Goldmeier, M.D., conducted a psychiatric examination. He found her speech and form of thought normal, but found her general appearance, affect, content of thought, sensoria, and judgment abnormal. His written reasons for finding certain conditions abnormal are completely illegible. Indeed, almost all of his notes from the examination are incomprehensible. Dr. Goldmeier appears to have assigned McCain a GAF score of 52 to 55.[19] (Tr. 427-35.)

On February 22, 2007, an x-ray of the sacroiliac joints showed a normal right sacroiliac joint, but erosive changes at the left sacroiliac joint. (Tr. 425.)

On February 16, 2007, McCain saw Dr. Williams, complaining of generalized pain. Her pain had not decreased, but she had reduced the amount of Vicodin she was taking. She had recently seen a psychiatrist, who diagnosed her with depression and anxiety. She was taking Effexor for her depression, but cut her dosage because it caused diarrhea. She walked the stairs at least once a day, but had not been following her regular walking program. A physical examination showed McCain was obese, but well groomed and in no apparent distress. She had normal station and gait, with no masses, effusions, or tenderness in the spine or upper and lower limbs. She had normal and symmetric muscle tone, but "throughout her examination, she demonstrated significant abnormal pain behavior." Her neck was supple with full range of motion. Her mood was anxious and depressed, but at times, normal and pleasant. Dr. Williams diagnosed McCain with generalized pain, lower back pain, and neck pain. Dr. Williams found no musculoskeletal or neuromuscular explanation for her symptoms. He also found no evidence of any neural compromise that

---

[19]A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components. On the GAF scale, a score of 51 to 60 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or co-workers). Diagnostic and Statistical Manual of Mental Disorders, 32-34 (4th ed., American Psychiatric Association 2000).

would account for the neck or back pain.  Dr. Williams wanted to reduce McCain's Vicodin prescription and have her start working on her own, before he ordered physical therapy.  (Tr. 393-95.)

On February 21, 2007, Dr. Williams completed a Physician's Assessment for Social Security Disability Claim form.  Dr. Williams characterized McCain's condition as "generalized pain without a neurovascular or musculoskeletal disorder to explain her symptoms."  In his assessment, he did not place any restrictions on McCain's ability to engage in prolonged sitting, standing, walking, and lifting objects of five pounds.  Dr. Williams also believed McCain was capable of performing sustained full-time employment at the sedentary level.  More to the point, he noted that she "should perform this level of activity – it is an important part of her treatment plan."  (Tr. 392.)

On March 2, 2007, Dr. Shaw completed a Physician's Assessment for Social Security Disability.  In the assessment, he noted McCain suffered from neck and back pain, possible fibromyalgia, and had difficulty performing any tasks because of constant pain and fatigue, and the inability to deal with stress.[20]  In the assessment, Dr. Shaw did not include any notes for the section requesting a "[s]ummary of pertinent clinical or laboratory findings."  (Tr. 411.)

On March 7, 2007, Sona S. Kamat, M.D., a rheumatologist, examined McCain.  X-rays of her wrists were negative.  X-rays of her sacroilliac joints revealed erosive changes at the left sacroilliac joint, but a normal right sacroilliac joint.  A physical examination showed her chest was clear and her heart rate and rhythm were regular with no murmurs.  She continued to have tenderness in all her joints.  Dr. Kamat diagnosed McCain with possible inflammatory arthritis, positive rheumatoid factor,

---

[20]Fibromyalgia is a condition that causes fatigue, muscle pain, and "tender points."  Tender points are places on the neck, shoulders, back, hips, arms or legs that hurt when touched.  Fibromyalgia is also associated with difficulty sleeping, morning stiffness, headaches, and problems with thinking and memory.  Medline Plus, http://www.nlm.nih.gov/medlineplus/fibromyalgia.html (last visited July 9, 2009).

elevated sedimentation rate, and elevated ALT and AST.[21] Dr. Kamat found McCain had normal kidney and muscle enzymes, normal thyroid function, and no sign of Hepatitis C or Lupus. Dr. Kamat prescribed Plaquenil and Arthrotec, and suggested a follow-up in a month's time.[22] (Tr. 152-54.)

On April 30, 2007, Dr. Kamat examined McCain. McCain had begun taking Methotrexate, and had ongoing complaints of joint pain, joint swelling, muscle pain, and diffuse muscle weakness.[23] A physical examination showed diffuse tenderness in all the small joints in her hands (which she attributed to having her fingers caught in a car door as a child), and tenderness in her wrists. Dr. Kamat diagnosed her with undifferentiated polyarthropathy with positive rheumatoid factor, an elevated sedimentation rate, and fibromyalgia syndrome.[24] Dr. Kamat had McCain continue on the Methotrexate and Plaquenil, and scheduled a follow-up in a month's time. (Tr. 150-51.)

**Testimony at the Hearing**

On March 21, 2007, McCain testified before the ALJ. She last worked as a medical administrator, and noted earning a few thousand dollars in the first quarter of 2006 while at Genesis OB/GYN. In

---

[21]A sedimentation rate blood test measures how quickly red blood cells settle in a test tube. The rate helps test for inflammation, the progress of a disease, or the efficacy of a treatment. WebMD, http://www.webmd.com/a-to-z-guides/sedimentation-rate (last visited July 9, 2009). ALT and AST tests help indicate whether there is liver damage. WebMD, http://www.webmd.com/digestive-disorders/aspartate-aminotransferase-ast (last visited July 9, 2009).

[22]Plaquenil is used, with other medications, to treat auto-immune diseases like lupus or arthritis. It can reduce skin problems associated with lupus and prevent swelling from arthritis. Arthrotec is used to relieve pain, swelling, and joint stiffness caused by arthritis. WebMD, http://www.webmd.com/drugs (last visited July 9, 2009).

[23]Methotrexate is used to treat certain types of cancer or to control severe psoriasis or rheumatoid arthritis. This medication works by interfering with cell growth and by suppressing the immune system. WebMD, http://www.webmd.com/drugs (last visited July 9, 2009).

[24]Arthropathy is any disease affecting a joint. Stedman's Medical Dictionary, 136.

February 2005, McCain was involved in a car accident, which damaged her neck and back.  She experienced stiffness and constant pain in her neck. The pain stayed in the neck, but the intensity of the pain changed.  The pain in her lower back went from her neck down her spine, and radiated to her right hip and abdomen.  The pain in her back was also constant. The pain affected all her activities.  When McCain got up in the morning, she showered, but then had to rest again.  (Tr. 24-32.)

McCain also experienced pain in her joints, particularly in her fingers and toes.  Her rheumatologist told her she had rheumatoid arthritis, and prescribed Methotrexate.  She had high blood pressure, but the medication kept it under control.  She was weak in the legs and arms, and suffered from chest pain.  McCain did not believe she could continue to do her job.  After her accident, she worked with the benefit of pillows, a neck rest, head phones, foot rests, and an extra thirty minutes at lunch to take a nap, but she was still unable to work because of the stress and pain on her body.  (Tr. 30-33.)

McCain experienced stiffness all over her body.  Her energy level was very low, and she had chronic fatigue and chronic nausea.  She also suffered from depression.  She was seeing a psychiatrist, and felt depressed nearly all the time, though the medication helped a little. She had trouble concentrating because of the pain, and spent most of her time just laying around.  McCain estimated she spent every twenty to thirty minutes laying down.  In a typical eight-hour day, McCain estimated that she spent five or six hours laying down.  Certain times, it was worse, and it seemed as if she was on bed rest.  McCain's medication caused nausea, dizziness, and upset stomach.  (Tr. 33-35.)

During the hearing, Geoffrey Magrowski testified as a vocational expert (VE).  The ALJ had the VE assume that McCain could lift and carry up to twenty pounds occasionally and ten pounds frequently, could sit, stand, or walk for six hours in an eight-hour day, but could not reach overhead on a repetitive basis.  Under these conditions, the VE testified that McCain could perform her past work as a medical administrator or office manager, and claims file clerk.  The ALJ also had the VE assume that McCain could lift and carry ten pounds occasionally and carry less than ten pounds frequently, could sit for

six hours in an eight-hour day, could stand or walk for two hours in an eight-hour day, but could not reach overhead on a repetitive basis. Under these conditions, the VE testified that McCain could perform the same jobs previously indicated. The VE testified that his responses were consistent with the <u>Dictionary of Occupational Titles</u>. If McCain was unable to deal with any stress and needed to frequently rest during the day, the VE testified that she would not be able to perform the job previously indicated. (Tr. 35-39.)

### III. DECISION OF THE ALJ

The ALJ noted that McCain suffered from rheumatoid arthritis and degenerative changes of the spine, complicated by obesity. The ALJ found these impairments were severe, but that they did not meet the listing requirements. McCain had worked for a year after her car accident, and her medication kept her arthritis under control. (Tr. 11-12.)

The ALJ discounted the conclusion of Dr. Shaw because his opinion of disability was inconsistent with his treatment notes and the record as a whole. The medical record indicated McCain had no cervical or thoracic tenderness, only mild limitation of cervical motion, a regular heart rate, clear lungs, no arm or leg swelling, nearly full muscle strength, normal gait, and MRI findings showed only mild degenerative changes with no spinal cord compression. The ALJ found that McCain's improvements from physical therapy were inconsistent with her claim that any movement exacerbated her symptoms. Dr. Schwent found no cervical tenderness, normal cervical motion, no paraspinal tenderness, normal joint motion, and no motor or sensory deficits. Dr. Margherita found McCain was exhibiting self-limited range of motion. Dr. Sallis found McCain had a normal affect, steady gait, no neck or back tenderness, and full range of motion in her arms and legs. Because Dr. Shaw's opinion was inconsistent with his own notes and the record as a whole, the ALJ favored the opinions and records of Dr. Margherita, Dr. Sallis, and Dr. Schwent over the opinion of Dr. Shaw. (Tr. 12-14.)

During a hospital visit on February 15, 2006, McCain had no neck or back tenderness, full range of motion in her neck, arms, and legs,

and no sensory or motor deficits. The ALJ found these findings inconsistent with an inability to perform even light work. The ALJ also noted that after steroid injections, McCain tolerated joint mobilization. During another trip to the emergency room, Dr. Sallis found no evidence of neck or back tenderness, and full range of motion in the arms and legs. The ALJ found these findings inconsistent with the inability to perform light work. Dr. Margherita also noted some self-limiting behavior by McCain, with no objective findings of abnormality. Dr. Williams indicated McCain had generalized pain without any disorder to explain her symptoms. He found no work-related restrictions, and concluded McCain did not need to rest during an eight-hour workday. The ALJ found these findings inconsistent with disability. Finally, the ALJ noted that Dr. Kamat had only recently diagnosed McCain with rheumatoid arthritis, and there was no indication that this condition was disabling, particularly on a twelve-month basis. (Tr. 14-16.)

The ALJ found McCain's ability to walk daily, care for her visually-impaired daughter, and take care of her mother's finances indicated McCain had mental stamina, physical stamina, the ability to concentrate, and the ability to use her arms and legs. The ALJ found these abilities were inconsistent with an inability to perform light work. In addition, the ALJ found McCain's ability to care for her daughter contradicted her testimony that she spent most of the day laying in bed. No doctor had stated that McCain needed extensive rest, further detracting from McCain's credibility. McCain complained of certain side-effects from her medication, but the ALJ found no indication McCain had reported these issues to her doctor, or that these side-effects could not be controlled. Accordingly, the ALJ discounted the effect of the alleged side-effects. (Tr. 16-17.)

The ALJ found McCain's depression was not disabling. McCain had been diagnosed with depression, but she did not seek regular psychiatric treatment. In addition, Dr. Margherita found she exaggerated her physical symptoms, creating doubt about the veracity of her non-physical symptoms. Dr. Goldmeier found McCain had normal speech and thought, and

fair insight and judgment. Finally, McCain did not allege disabling psychiatric symptoms in her application. (Tr. 17.)

McCain complained of neck, back, and body pain. Yet, she did not maintain a consistent regimen of strong pain relief medication, and showed a strong response to non-steroid anti-inflammatory medication. McCain did not seek regular treatment for her hypertension, rheumatoid arthritis, and degenerative changes in her spine, and there was no indication McCain's economic situation impeded her ability to receive care. Her joint, back, and neck discomfort, and depression and anxiety could be controlled with medication. There was no medical evidence that any doctor ever imposed long term and significant restrictions on McCain's functioning. There was no evidence McCain ever required surgery or prolonged hospitalization. A physical therapist found McCain had been noncompliant with her home exercises. The ALJ also noted that a disability finding could prove helpful in the pending lawsuit concerning the car crash. Based on all the evidence, the ALJ concluded that McCain retained the residual functional capacity (RFC) to frequently lift not more than ten pounds and occasionally lift not more than twenty pounds, to sit, stand, and walk for six hours in an eight-hour workday, but not to reach overhead. Based on the testimony of the VE, the ALJ concluded that McCain could perform her past work as a medical administrator and office clerk, and that she was not disabled within the meaning of the Social Security Act. (Tr. 17-20.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely

because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work. Id. The claimant bears the burden of demonstrating she is no longer able to return to his past relevant work. Id. If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. Id.

In this case, the Commissioner determined that McCain could perform her past work.

## V. DISCUSSION

McCain argues the ALJ's decision is not supported by substantial evidence. First, she argues the ALJ failed to properly weigh the opinion of the treating physician. Second, she argues the ALJ erred by relying on a lay opinion to determine her RFC. (Doc. 8.)

**Weighing Medical Testimony**

McCain argues the ALJ's opinion contains inaccuracies, and that these inaccuracies led the ALJ to improperly weigh the opinion of Dr. David Shaw, a treating physician.

The ALJ has the role of resolving conflicts among the opinions of various treating and examining physicians. Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001). The ALJ may reject the conclusions of any medical expert, whether hired by the government or the claimant, if they are inconsistent with the record as a whole. Id. Normally, the opinion of the treating physician is entitled to substantial weight. Casey v. Astrue, 503 F.3d 687, 691 (8th Cir. 2007). The opinion of a consulting physician, who examines a claimant once, or not at all, generally receives very little weight. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).

Still, the opinion of the treating physician is not conclusive in determining disability status, and must be supported by medically acceptable clinical or diagnostic data. Casey, 503 F.3d at 691. The ALJ may credit other medical evaluations over the opinion of a treating physician if the other assessments are supported by better or more thorough medical evidence, or when the treating physician's opinions are internally inconsistent. Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005); Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000). In determining how much weight to give a treating physician's opinion, the ALJ must consider the length of the treatment relationship and the frequency of examinations. Casey, 503 F.3d at 692.

The ALJ discounted the opinion of Dr. Shaw because it was inconsistent with his own notes and the record as a whole. Instead, the ALJ favored the opinions and records of Dr. Margherita, Dr. Sallis, and Dr. Schwent over the opinion of Dr. Shaw.

As an initial matter, there are very few treatment notes from Dr. Shaw himself. On August 8, 2006, Dr. Feinberg remarked that McCain's internist was frustrated with her chronic pain, and thought "the severity of the pain [did] not match her exam." (Tr. 346.)

On September 23, 2005, Dr. Shaw referred McCain to Dr. Lu, a neurologist. During this visit, Dr. Lu found McCain's neck showed no

significant tenderness along the axial, cervical, or thoracic spine, and found no evidence of any obvious cervical spine deformity or spinal cord compression.  Dr. Lu did not believe McCain's symptoms were consistent with either radiculopathy or myelopathy, and recommended against spine surgery.  See Craig v. Chater, 943 F.Supp. 1184, 1189 (W.D. Mo. 1996) ("Allegations of a disabling impairment may be properly discounted because of inconsistencies such as minimal or conservative medical treatment.").

On March 27, 2006, Dr. Shaw examined McCain, and found she was in moderate distress from her pain and exhibited weakness in her right side.  At the same time, Dr. Shaw found she had full range of motion in the extremities.  He diagnosed Shaw with pain in the neck, lower back, right arm, legs, and with parethesias of the right side.  The notes from this visit are limited to one page of handwritten notes.  That same day, Dr. Shaw completed a physician's statement for a life insurance company, in which he simply checked the relevant boxes.  The form included no medical analysis.

On January 10, 2007, Dr. Shaw referred McCain to Dr. Williams. During this visit, Dr. Williams found McCain "demonstrated significant abnormal pain behavior," and found no evidence of any significant neural impingement on either the lumbar spine or the cervical spine. See Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995) (the lack of objective findings to support pain is strong evidence of the absence of a severe impairment).  More to the point, Dr. Williams recommended that McCain go back to work as soon as possible.  Hensley v. Barnhart, 352 F.3d 353, 357 (8th Cir. 2003) ("[N]o functional restrictions were placed on [claimant's] activities, a fact that we have previously noted is inconsistent with a claim of disability.").  Dr. Williams discussed McCain's situation with Dr. Shaw, and according to Dr. Williams, Dr. Shaw reviewed the note and was "in agreement."  (Tr. 402.)

Finally, on March 2, 2007, Dr. Shaw completed a Physician's Assessment for Social Security Disability.  In the assessment, he noted McCain suffered from neck and back pain, possible fibromyalgia, and had difficulty performing tasks because of stress, pain, and fatigue. However, Dr. Shaw did not include any pertinent clinical or laboratory

findings to accompany his conclusions.  This assessment, like the one from March 27, 2006, included only one page of hand-written notes. See Swarnes v. Astrue, Civ. No. 08-5025-KES, 2009 WL 454930, at *11 (D.S.D. Feb. 23, 2009) ("It is appropriate to give little weight to statements of opinion by a treating physician that consist of nothing more than vague, conclusory statements.").

Dr. Shaw's medical assessments were often bare conclusions with little, if any, clinical or laboratory findings in support.  His assessments typically amounted to little more than a few paragraphs of hand-written notes.  See Browning v. Sullivan, 958 F.2d 817, 823 (8th Cir. 1992) (noting that a conclusory diagnosis letter does not overcome substantial evidence to the contrary).  In contrast, reports from Dr. Lu and Dr. Williams, to whom Dr. Shaw referred McCain, were comprehensive, amounting to several type-written pages.  See Guilliams, 393 F.3d at 803 (noting the ALJ may credit other medical evaluations over the opinion of a treating physician if the other assessments are supported by better or more thorough medical evidence).

Dr. Shaw's conclusions were not only inconsistent with reports from Dr. Williams and Dr. Lu, they were inconsistent with several other sources as well.  Dr. Baber found McCain's vertebral bodies in good alignment and the intervertebral disk spaces well maintained throughout the cervical spine and thoracic region.  See id. 393 F.3d at 802 (finding the ALJ properly discounted claimant's complaints where an MRI revealed largely normal alignment and curvature of the spine, no muscle spasms, and no tender points).  Even with movement, there did not appear to be any significant instability.  During a visit to the emergency room, the examining doctor found McCain had normal range of motion in her neck, her cervical spine was non-tender, her back was normal upon inspection, and she had no motor or sensory deficits.  Dr. Margherita found McCain self-limited her range of motion during an exam, but still concluded that her range was within normal limits and that she could frequently sit, stand, walk, drive, and perform medium lifting.  Given the inconsistencies between Dr. Shaw's opinions and other medical evidence, as well as the lack of clinical or laboratory support sustaining his own opinions, substantial evidence supports the ALJ's

decision to discount Dr. Shaw's medical opinion. See <u>Pearsall</u>, 274 F.3d at 1219 (finding the ALJ may reject the conclusions of any medical expert if they are inconsistent with the record as a whole).

McCain also argues that the ALJ's opinion contains certain inaccuracies. In particular, she argues that the ALJ mistakenly identified Dr. Lu as Dr. Shaw. She also notes that the ALJ misidentified some of the doctors and the scope of their care during McCain's trips to the emergency room. However, each of these mistakes is innocent, and does not detract from the ALJ's decision to discount the opinions of Dr. Shaw. As noted above, Dr. Lu's opinion provided support for the ALJ's decision to discount the opinions of Dr. Shaw. In addition, any confusion by the ALJ about which doctor was performing which test had no effect on the substance of the ultimate medical determination. See <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1149 (8th Cir. 2001) ("Any arguable deficiency . . . in the ALJ's opinion-writing technique does not require [the reviewing court] to set aside a finding that is supported by substantial evidence.").

Finally, McCain argues the ALJ failed to mention the abnormal findings from the examination of Dr. Goldmeier. The ALJ did not rely on Dr. Goldmeier's conclusions in discounting Dr. Shaw's opinion; the ALJ only looked to the opinions of Dr. Margherita, Dr. Sallis, and Dr. Schwent. In addition, the report from Dr. Goldmeier is nothing but conclusions, with no evidence offered to support his normal or abnormal findings.

More to the point, there is no evidence in the record that indicates McCain's mental impairments were disabling. In her application for benefits and request for reconsideration, she did not list depression or another mental condition as disabling. On May 20, 2006, the emergency room notes indicate McCain had no previous psychiatric history. In January 2007, McCain's doctors referred her to a psychiatrist. At the hearing, she noted feeling depressed, but indicated that medication helped a little. Reviewing the medical record, there is no evidence McCain was ever hospitalized for mental conditions, suffered from any hallucinations or other psychotic symptoms, or experienced any extended episodes of decompensation. <u>See</u>

<u>Rose v. Apfel</u>, 181 F.3d 943, 945 (8th Cir. 1999) (finding claimant was not disabled because, among other reasons, she had not had any episodes of decompensation).  Reviewing the medical evidence, substantial evidence supports the ALJ's conclusion that McCain's depression was not disabling.  Any error relating to the ALJ's analysis of Dr. Goldmeier's opinion was therefore harmless.


**Lay Opinion Testimony**

McCain argues the ALJ erred by relying on lay testimony to determine her RFC.  Specifically, McCain notes that a social security form, entitled "Physical Residual Functional Capacity Assessment," was unsigned.

In his opinion, the ALJ relied on several different pieces of evidence in determining McCain's RFC.  The ALJ considered the medical opinions of Dr. Williams, Dr. Margherita, Dr. Sallis, Dr. Schwent, and Dr. Shaw.  The ALJ also considered McCain's testimony during the hearing, and the statements she made in her function report.  Finally, the ALJ looked to notes from McCain's physical therapy sessions.  <u>See</u> <u>Pearsall</u>, 274 F.3d at 1217-18 (noting the ALJ may look to "all relevant evidence," including the "observations of treating physicians and others" when making a RFC determination).  In determining McCain's RFC, there is no evidence the ALJ relied on the unsigned social security form.  <u>Compare</u> <u>Dewey v. Astrue</u>, 509 F.3d 447, 448 (8th Cir. 2007).  More to the point, McCain – and not the ALJ – bears the burden of establishing her RFC.  <u>Goff v. Barnhart</u>, 421 F.3d 785, 790 (8th Cir. 2005).

In <u>Dewey</u>, the ALJ "explicitly credited" a Physical RFC Assessment form in determining the claimant's RFC.  <u>Id.</u>  The ALJ also mistakenly believed the form had been completed by a physician when it had not.  <u>Id.</u> at 448-49.  Neither one of those two issues is present in this case.  First, there is no indication the ALJ relied on the statements within the Physical RFC Assessment form in determining McCain's RFC.  Second, the ALJ did not mistakenly believe the form had been completed by a

physician.  <u>Dewey</u> is therefore easily distinguished based on the facts of this case.  The ALJ did not impermissibly rely on lay testimony.

## VI.  RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed under Sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have ten days to file written objections to this Report and Recommendation.  The failure to file timely written objections may waive the right to appeal issues of fact.

    ___/S/___David D. Noce_____
    **UNITED STATES MAGISTRATE JUDGE**

Signed on July 24, 2009.